**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

PHYLLIS M. WESTMORELAND,

      Plaintiff,

      v.

PRINCE GEORGE'S COUNTY,

      Defendant.

Civil Action No. TDC-14-0821

**MEMORANDUM OPINION**

Plaintiff Lieutenant Phyllis M. Westmoreland ("Lt. Westmoreland") is a former firefighter suing Prince George's County ("the County") under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17 (2012), for alleged removal from duty and constructive discharge in retaliation for her complaints about discrimination and harassment at the Prince George's County Fire Department. Presently pending before the Court is the County's Motion for Summary Judgment, ECF No. 57. Having reviewed the briefs and submitted materials, the Court finds no hearing necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the County's Motion for Summary Judgment is GRANTED.

**BACKGROUND**

**I.    Procedural History**

Lt. Westmoreland is an African American woman who began working at the Prince George's County Fire Department ("the Department") in October 1989 and resigned from the Department in October 2009. On September 18, 2009, while still employed by the Department, Lt. Westmoreland filed suit in this Court against the County based on alleged race and gender

discrimination, retaliation, and a hostile work environment, in violation of Title VII. 2d Am. Compl., *Westmoreland v. Prince George's Cty.*, No. AW-09-2453 (D. Md. Sept. 21, 2010), ECF No. 35 ("*Westmoreland I*"). Lt. Westmoreland's claims in that suit centered on her time at the Department's Fire/Emergency Medical Services Training Academy ("the Academy") and the fallout from a 2006 cheating scandal at that facility. As part of her allegations, she asserted that as a result of race and gender discrimination and in retaliation for her complaints about disparate treatment in the investigation into the cheating scandal, she had been reassigned to a post at Fire Station 40 ("Station 40").

In April 2013, *Westmoreland I* went to trial. At trial, Lt. Westmoreland was precluded from introducing evidence related to alleged additional discrimination at Station 40. Lt. Westmoreland was also precluded from introducing medical evidence from 2009, which she argued was relevant to a constructive discharge claim. The County objected to the evidence, asserting that no claim for constructive discharge had been alleged in the Complaint, and the Court agreed. At the close of trial, the Court granted the County's motion for judgment as a matter of law on all but Lt. Westmoreland's retaliation claim, which was submitted to the jury. On April 12, 2013, the jury returned a verdict in Lt. Westmoreland's favor on that claim, finding that her transfer to Station 40 was in retaliation for her complaints about the Department's handling of the 2006 cheating scandal.

On March 18, 2014, Lt. Westmoreland filed the present suit ("*Westmoreland II*"). In her May 9, 2014 Amended Complaint, she alleged six causes of action under both Title VII and the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code, State Gov't. § 20-606 (2014): (I) hostile work environment at Station 40 based on gender; (II) retaliation in the form of removal from duty based on a December 9, 2008 complaint to her supervisor; (III) retaliation in

2

the form of discipline based on five disciplinary offenses levied against her in 2006-2007 in response to her October 2006 EEOC Complaint about events at the Academy; (IV) retaliation in the form of constructive discharge in response to her October 2006 EEOC Complaint; (V) gender discrimination based on disparate treatment in discipline; and (VI) gender discrimination based on disparate treatment through constructive discharge. The County moved to dismiss or, in the alternative, for summary judgment on all of Lt. Westmoreland's clams, asserting that Lt. Westmoreland was essentially relitigating events that had been the subject of *Westmoreland I*. Specifically, the County argued, as relevant here, that the claims in *Westmoreland II* were barred by a failure to exhaust administrative remedies, the doctrine of laches, *res judicata*, the applicable statutes of limitations, and judicial estoppel.

On March 4, 2015, this Court, construing the County's Motion as a Motion to Dismiss, granted the Motion as to Lt. Westmoreland's Title VII claims under Counts I, III, V, and VI of the Amended Complaint and all of Lt. Westmoreland's state law claims. The Court denied the Motion as to Count II, a retaliation claim arising from Lt. Westmoreland's removal from duty following her December 9, 2008 complaint to her supervisor, and on Count IV, a retaliation claim arising from Lt. Westmoreland's alleged constructive discharge in response to her 2006 EEOC complaint. The Court limited Lt. Westmoreland's Count IV claim to events occurring after her transfer to Station 40 that did not arise from the events at the Academy.

## II.    Station 40

Because this Court has limited the claims in *Westmoreland II* to those of retaliation stemming from events unrelated to Lt. Westmoreland's time at the Academy that occurred after her transfer to Station 40, it recounts only the record evidence that relates to those events.

3

### A.    2007 Incidents

On October 10, 2006, Lt. Westmoreland was informed that she had been transferred from the Academy to Station 40, located in Brandywine, Maryland, a job with very different responsibilities than the training position she had at the Academy. Station 40 was a rescue squad, and Lt. Westmoreland would be responsible for overseeing the Station's responses to fires and medical emergencies as well as extrications from vehicles. In Lt. Westmoreland's estimation, the transfer was undesirable. Lt. Westmoreland reported to Station 40 on October 18, 2006. On October 20, 2006, she filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") based on discipline meted out for her alleged involvement in the Academy cheating scandal and her transfer to Station 40. That Charge was the basis for the claims litigated in *Westmoreland I*.

On March 18, 2007, Volunteer Chief Chad Lallier sent an email to Battalion Chief Steven White asking to have Lt. Westmoreland assigned to a different station. He stated that although he thought Lt. Westmoreland was "personable," members of his crew did not want to go on calls with her because they did not trust her ability to make decisions. Lallier Email at 2, Opp'n Mot. Summ. J. ("Opp'n") Ex. 28, ECF No. 63-29. Because Station 40 was in an area where it could take 10 to 15 minutes for another crew or chief to arrive, he suggested that Lt. Westmoreland should be assigned to a station closer to one with a battalion chief on site, which would ensure that if she hesitated or made a questionable decision, it could be promptly corrected. On March 22, 2007, Volunteer Chief Lallier and Volunteer Chief Donald Prather met with Major ("Maj.") Denton Rourke and Captain ("Capt.") Mark Smith, one of Lt. Westmoreland's supervisors at Station 40, about the situation. The Volunteer Chiefs' specific concerns were that Lt. Westmoreland did not timely respond to radio calls, that she was not always on the correct radio

4

channel, and that, once on the scene of an incident, she and her crew did not always properly carry out their duties. In response to these concerns, Maj. Rourke instituted a 30-day review period for Lt. Westmoreland, which expired without incident. No official reprimand was placed in Lt. Westmoreland's personnel file based on this incident.

At the close of her first year at Station 40, Lt. Westmoreland received a positive performance review. For the period from October 9, 2006 to October 9, 2007, she was given an "exceeds satisfactory" rating in five of six categories—the second best rating possible—and received a top mark of "outstanding" in the sixth. Based on the evaluation, Lt. Westmoreland was approved for a yearly merit pay increase. On December 2, 2007, Capt. Matthew Ludy, one of Lt. Westmoreland's Station 40 supervisors, sent a memorandum to the Fire Chief detailing the basis for Lt. Westmoreland's evaluation. In particular, he stated that she was "very decisive, comfortable and confident in implementing and executing her skills and decisions," that she "ensures operational readiness of all apparatus," that she conducts herself "in a professional manner," that she "maintains a positive attitude," and that she "truly goes above and beyond to ensure that she and the department are viewed favorably." Ludy Eval. Ltr. at 3-4, Opp'n Ex. 4, ECF No. 63-6.

On December 4, 2007, Lt. Westmoreland and her crew were called out to a fire from which they returned in the early hours of December 5, 2007. At about 6:30 that morning, when Capt. Ludy was beginning his shift, he discovered that the equipment Lt. Westmoreland and her crew had used had not been adequately returned to a state of readiness for future use. As a result, on December 12, 2007, Lt. Westmoreland received a Periodic Performance Assessment writing her up for failures in operational readiness. That assessment, which is unsigned, indicated that several tools had dirt and debris on them, a thermal imager had the battery inserted

upside down, and wet towels were left in a compartment. Lt. Westmoreland was informed that she would be monitored for three months to ensure that her crew was adhering to the Department's readiness standards.

In a December 16, 2007 memorandum to Capt. Ludy, Lt. Westmoreland took issue with the evaluation, contesting certain allegations and noting that no one had consulted her or her crew about the reported deficiencies before writing her up. She expressed her belief that complaints about her and her crew were considered true without any further investigation and described the evaluation as "another form of harassment." Westmoreland Mem. at 3, Opp'n Ex. 6, ECF No. 63-7. Lt. Westmoreland filed no formal grievance as a result of this incident, and her period of monitoring expired without further incident.

## B.    May 16, 2008 Incident

On May 16, 2008, Station 40 was called out to an automobile accident at which Lt. Westmoreland ordered an extrication of the vehicle's passenger. Paramedics from Station 25 were also on the scene. Paramedic Kerper thought that Lt. Westmoreland's extrication procedure was unsafe, prompting the paramedics to take photographs of the operation and to express their concerns to police officers on the scene. Kerper and other paramedics reported the incident to both the Department's Safety Officer and to Battalion Chief Adon Snyder.

Lt. Westmoreland learned from one of her crew that Kerper thought her operation had been unsafe and that he was going to have her written up. She complained to Battalion Chief Snyder about the paramedics' photographing of the procedure. According to Lt. Westmoreland, a paramedic supervisor conducted an investigation during which Kerper admitted that his comments had been unprofessional. When Battalion Chief Snyder interviewed Station 25 Capt. Helminiak about the incident, Capt. Helminiak suggested that although Lt. Westmoreland's

operation could have been conducted more safely, he was not as alarmed as his paramedics were by the incident. Capt. Helminiak surmised that they may have embellished the danger of the operation because they did not respect Lt. Westmoreland. Battalion Chief Snyder found no evidence that the paramedics had photographed Lt. Westmoreland at any other incident. Based on this information, Battalion Chief Snyder concluded that the paramedics had displayed a degree of disrespect towards Lt. Westmoreland, that there were ongoing personality conflicts between Lt. Westmoreland and the Station 25 paramedics, and that Lt. Westmoreland was quick to go on the defensive because she regularly perceived a lack of respect from others.

### C.      December 2008 Glove Incident

On approximately December 6, 2008, a pair of dirty gloves was left on the front seat of a fire engine. Assuming the gloves belonged to Lt. Westmoreland, a volunteer firefighter passed the gloves to Volunteer Chief Robert Smalls of the Clinton Fire Station, who sent the items to Lt. Westmoreland through inter-office mail. When Lt. Westmoreland received the package, she was offended that the sender had assumed that she had left the gloves, which she asserts she did not do. She then mailed the gloves back to Chief Smalls through inter-office mail and notified Battalion Chief Mark Smith of the incident. Battalion Chief Smith met with Chief Smalls, informed him that there were better ways to handle the situation, and considered the matter closed.

### D.      December 6, 2008 Acton Lane Incident

On December 6, 2008, Lt. Westmoreland and her crew were called to a fire at a house on Acton Lane in Charles County, Maryland. Once on the scene, the Station 40 crew was instructed to take lights to the backyard. Later, Volunteer Lt. William Marty Thompson of the Waldorf Volunteer Fire Department was instructed by Capt. Jeff Duer to ask Station 40 to bring shovels

to the house to help the Fire Marshal.  By that point, Lt. Westmoreland had returned to the Station 40 fire engine and was sitting in the front seat while her crew gathered equipment.  From there, the accounts of what happened diverge.

According to Lt. Thompson, he approached Lt. Westmoreland and asked her to have her crew bring shovels to the house, and Lt. Westmoreland agreed.  Several minutes after Lt. Thompson returned to the interior of the house, no one from the Station 40 crew had arrived with shovels, so he went back to repeat his request.  Lt. Westmoreland responded that her crew was packing up its equipment first.  When Lt. Thompson told her that the Fire Marshal was waiting, Lt. Westmoreland repeated, in a loud voice, that she and her crew were packing up first.  Lt. Thompson replied, "So you're telling me to go tell the Fire Marshal that he has to hold his investigation until you are done packing up?"  Thompson Aff. ¶ 14, County Mot. Summ. J. ("Mot.") Ex. 4, ECF No. 57-7.  Lt. Westmoreland then "got into" Lt. Thompson's face and began yelling and cursing at him while also pointing the antenna from her radio in his face.  *Id.* ¶ 15.  Lt. Thompson asked firefighters from Charles County to radio for a Prince George's County battalion chief to come to the scene.  This altercation took place in front of several members of Lt. Westmoreland's crew, who, according to Lt. Thompson, seemed shocked.

Meanwhile, the scene caught the attention of Capt. Duer.  After seeing Lt. Westmoreland yelling and pointing her radio antenna in Lt. Thompson's face, he approached the two firefighters, but before he could intervene, Lt. Westmoreland turned and began to yell at him. When Capt. Duer asked Lt. Westmoreland to give him her name, rank, and identification number, she yelled her name in response, prompting Capt. Duer to ask her to write the information down.  This request sparked more yelling from Lt. Westmoreland, followed by a second request from Capt. Duer that she write down the requested information and an order that

she pack her gear and leave the scene. Capt. Duer never received the requested information from Lt. Westmoreland. Prior to this incident, neither Lt. Thompson nor Capt. Duer knew who Lt. Westmoreland was or that she had previously filed any internal or external charges of discrimination against the Department.

Lt. Westmoreland gave a different account. According to her, in response to Lt. Thompson's request for shovels, she explained that they were packing up equipment and refueling their saw and would bring the shovels afterwards. When she asked him if any of the other crews had shovels, he said that they did not. He did not tell her that the request for shovels was coming from the Fire Marshal. During this interaction, Lt. Westmoreland bristled at his demeanor because Lt. Thompson, a volunteer firefighter, had approached her as if he were her peer officer, which she felt was unprofessional. After this conversation, Lt. Thompson walked over to the Incident Commander, looked in Lt. Westmoreland's direction, and then quickly returned and insisted, "I need the shovels now!" This time, he was in Lt. Westmoreland's personal space, in a way that Lt. Westmoreland found threatening and unprofessional. Lt. Westmoreland told him that there was no need to speak to her like that and then had "an exchange of words" with Lt. Thompson. Westmoreland Stmt. at 1, Mot. Ex. 7.14, ECF No. 57-26. In that exchange, she was angry, so she yelled at him to get out of her space and not to talk to her that way. When Capt. Duer came over, she tried to explain what was happening, but he cut her off and asked for her name and identification number. She gave the information to him, and he then asked her to write it down. When she turned to do so, he told her to pack up and go back to the station. She denies yelling at Capt. Duer.

Lt. Thompson's and Capt. Duer's accounts were corroborated by other firefighters on the scene who had not previously met Lt. Westmoreland. Lt. Thomas Edwards of the Waldorf

Volunteer Fire Department reported that he saw Lt. Thompson and Lt. Westmoreland having a heated discussion during which Lt. Westmoreland was yelling but Lt. Thompson did not raise his voice, and that after the incident, Lt. Westmoreland's crew apologized for her actions. Assistant Fire Chief Mark Bryant, who was visiting from South Carolina, recalled seeing Lt. Westmoreland screaming at Lt. Thompson with her arms raised, and then, after Capt. Duer asked her to provide her name, rank, and identification number, he heard her muttering that she would give "her damn name and number to whoever wanted it" as she walked passed him. Bryant Stmt., Mot. Ex. 7.3, ECF No. 57-15. Assistant Fire Chief Bryant asserted that Lt. Westmoreland's actions had not been professional or courteous and that they had been witnessed by several members of the public.

Firefighters from Lt. Westmoreland's crew either corroborated parts of Lt. Thompson's story or told no story at all. Volunteer Lt. Chris Goldsmith recalled hearing Lt. Thompson say in passing that he would not be cursed out on the fire ground. Both he and Volunteer Firefighter Matthew Thompson asserted that upon their return to Station 40, they were told that a battalion chief would be arriving to take statements, and that the career firefighters—Steven Strawbridge, Melvin Batts, and Douglas Charnock—were expressly instructed to report that they heard and saw nothing. In his statement, Firefighter Strawbridge stated that he was putting tools away, so he had his back to the encounter. Firefighter Charnock stated that he was putting equipment away, so although he heard voices behind him, he did not know what was said. Firefighter Batts asserted simply that he did not see or hear anything.

In response to Lt. Thompson's request for a battalion chief to come to the scene, Battalion Chief Sayshan Conver-White was dispatched to investigate the incident and arrived at Station 40 to take statements soon after the crew returned from Acton Road. In the ensuing days,

10

she also interviewed Lt. Thompson and Lt. Westmoreland and obtained written statements from other individuals on the scene.  Based on her investigation, Battalion Chief Conver-White concluded that Lt. Westmoreland had been "yelling and screaming and her conduct and behavior was unacceptable."  Conver-White Aff. ¶ 9, Mot. Ex. 7, ECF No. 57-12.  She was unaware of Lt. Westmoreland's prior allegations of discrimination.

In a letter dated January 5, 2009, Lt. Westmoreland was notified that, based on its investigation, the Department had decided to impose a Step II Charge, a written notice of unsatisfactory conduct, against her for the December 6, 2008 Acton Lane altercation with Lt. Thompson.  Lt. Westmoreland later signed to acknowledge that charge on April 22, 2009.

### E.      December 9, 2008 Complaint

On December 9, 2008, Lt. Westmoreland emailed Capt. James Reilly, the supervisor of Station 40, about the December 6, 2008 altercation with Lt. Thompson.  She asserted that Lt. Thompson had been the aggressor, that his demeanor had left her feeling threatened and fearful, and that she had provided Capt. Duer with the information he had requested.  She also asserted that Battalion Chief Conver-White had confided to her that she believed the other firefighters on the scene had "misconception problems" about Lt. Westmoreland.  Westmoreland Email at 2, Mot. Ex. 13.2, ECF No. 57-40.  Lt. Westmoreland complained about the lack of support in the face of the volunteer firefighter's unprofessional behavior and the fact that the investigation overly scrutinized her conduct instead of focusing on Lt. Thompson.  She also complained that prior issues she had raised had not been adequately investigated, specifically her concerns about the March 2007, December 2007, and May 2008 incidents.  She labeled this series of incidents "harassment and unfair treatment" and issued a plea that the "harassment must stop." *Id.* at 3.

11

Lt. Westmoreland closed the email by requesting immediate intervention and that her email be sent up the Department's chain of command.

### F. January 19, 2009 Incident

On January 19, 2009, the Baden Volunteer Fire Department, led by Volunteer Fire Capt. Robert Yates Clagett, was the first crew to respond to a fire at a store on Crains Highway in Cheltenham, Maryland. The fire was confined to the exterior of the building. Lt. Westmoreland and other Station 40 personnel arrived at some point later. The Department's General Orders require that crews on the scene follow a chain of command in which captains outrank lieutenants and which does not distinguish between career and volunteer firefighters.

According to Capt. Clagett, when he arrived on the scene, he was informed by Battalion 7 that he was in charge of the interior operations for the building, but at some later point that responsibility was shifted to Battalion 5, with Capt. Clagett and his crew instructed to remain working inside the building. At one point, Capt. Clagett found Lt. Westmoreland and her crew pulling out a panel from an inside wall in a small office. Capt. Clagett instructed them to stop, explaining that because the fire was outside, they should try to destroy as little as possible of the building interior. Lt. Westmoreland ignored his instruction, responding instead that she took her orders from Battalion 5. At that point, however, no one from Battalion 5 was on site. Rather than pointing this out, Capt. Clagett left the area, then returned some time later, accompanied by Volunteer Firefighter Joe Addison. When Capt. Clagett asked Lt. Westmoreland, "What are we doing?," Lt. Westmoreland began yelling and cursing, including shouting, "shut the fuck up and get out." Clagett Stmt. at 2, Mot. Ex. 9.1, ECF No. 57-32. When Capt. Clagett tried to explain that he did not mean anything by his question, Lt. Westmoreland continued to yell. According to Addison, when he tried to intervene and noted that they were all on the same team, Lt.

Westmoreland turned her ire towards him, cursing repeatedly and making derogatory remarks about his height.  Clagett instructed Addison to summon Volunteer Battalion 7 Chief Francis Winterwerp.

According to Lt. Westmoreland, upon arriving at the fire, she received direction from Capt. Clagett to conduct an "outside check."  Westmoreland Stmt., Opp'n Ex. 17, ECF No. 63-18.  Before beginning that task, she ran into Battalion Chief Tharp, who instead instructed her to check for an extension at the base of the floor, which she and her crew then began to do.  As they did so, Capt. Clagett returned and told her that she was doing the wrong thing.  When she explained that she was carrying out Battalion Chief Tharp's orders, Battalion Chief Tharp returned and verified to Capt. Clagett in a discussion outside the building that he had asked Lt. Westmoreland to take this step.  Nevertheless, Capt. Clagett reentered the building and asked Lt. Westmoreland what she was doing, which resulted in an argument during which there was "an exchange of words."  *Id.*

When Battalion Chief Winterwerp learned of the situation, he called in Volunteer Chief Wendy Baden of the Baden Volunteer Fire Department, who conducted an investigation of the incident.  At the time that Battalion Chief Winterwerp enlisted Chief Baden to investigate the incident, he did not know of Westmoreland's prior complaints of discrimination, but he had had several interactions with her in which he felt that she had been disrespectful to him and his crew by ignoring his commands.  As part of her investigation, Chief Baden collected written statements from Capt. Clagett, Addison, and Lt. Westmoreland.  Lt. Westmoreland's crew provided statements in which they uniformly stated that they neither saw nor heard anything.

13

### III.    Removal from Duty

As a result of the January 19, 2009 incident, Lt. Westmoreland received a supervisory referral to the Department's Employee Assistance Program ("EAP").  After speaking with Lt. Westmoreland on the phone, Latif Rasheed, an EAP counselor, recommended that Lt. Westmoreland be placed on administrative leave followed by sick leave.  After she was informed that she was being relieved of duty, Lt. Westmoreland encountered Capt. Reilly at Station 40. According to Capt. Reilly, Lt. Westmoreland said that she "should go get her Glock and shoot up everyone in here."  Reilly Aff. ¶¶ 9-11, Mot. Ex. 11, ECF No. 57-34.  Prior to this incident, Capt. Reilly did not know that Lt. Westmoreland had previously filed any formal charge of discrimination against the Department.

When interviewed later, Lt. Westmoreland acknowledged that she mentioned a gun in her exchange with Capt. Reilly, but in a different context.  She recounted that after she was relieved of duty, Capt. Reilly was walking right behind her, as if he was escorting her out of the station. In response, she remarked, "Dag, Captain Reilly, why you up on me like that?  Do you think I'm going to go out to my car and get a Glock or something?  That was a joke by the way, so I don't want to hear you say I made a threat about a gun!"  Westmoreland Interview Notes at 6, Mot. Ex. 13.1, ECF No. 57-39.  She added that her reference to a gun was a result of the fact that earlier on January 19, 2009, they had a call for a fire at the Beretta gun factory.

On January 22, 2009, Lt. Westmoreland emailed Fire Chief Michaelides, Capt. Reilly, and others to assert that she was continuing to be subjected to harassment, to note that she had previously sent multiple emails requesting assistance, and to request a meeting with Lieutenant Colonel ("Lt. Col.") Wells.  When Chief Michaelides responded that he had no record of any internal complaints about harassment, she listed dates on which she had notified management of

the alleged harassment, including after the above-described incidents in March 2007, December 2007, May 2008, and December 2008.

On February 2, 2009, in response to that email, Lt. Westmoreland met with Lt. Col. Wells. Lt. Westmoreland complained about what she felt was a one-sided determination to refer her to EAP and to remove her from duty, without any investigation into her version of the January 19, 2009 events. She suggested that the EAP referral and removal from duty followed an ongoing pattern under which complaints about her were immediately believed, while her complaints went nowhere. She expressed that she was a repeated victim of false allegations and a false investigation process, and that she was disciplined for behavior that was tolerated in others.

Beginning on January 23, 2009, Lt. Westmoreland went on sick leave. Starting on February 2, 2009, she took Family Medical Leave Act ("FMLA") leave, citing work stress, that continued until April 4, 2009. That day, Lt. Westmoreland returned to work on light duty, in a position in the Department's Bureau of Occupation Safety and Health. That position was a full-time office job for which Lt. Westmoreland received her full salary. In June 2009, Lt. Westmoreland complained of heart palpitations on the job, prompting her to file an injury claim and to seek disability leave. Both requests were later denied.

In early July 2009, the Department sent Lt. Westmoreland a series of letters notifying her that unless she submitted updated medical information, she would have to be returned to full duty. In a letter dated July 22, 2009, Lt. Westmoreland's psychiatrist recommended that her status remain the same because "the current full-duty nonoperational status remains clinically appropriate." Psychiatrist Ltr., Opp'n Ex. 34, ECF No. 63-35. On August 7, 2009, the Department's Medical Advisory Board ("MAB") advised the Fire Chief that Lt. Westmoreland

was fit for full duty, a determination that was memorialized in a letter and sent to Lt. Westmoreland on August 11, 2009. On August 17, 2009, Lt. Westmoreland requested additional FMLA leave and was permitted to remain on FMLA status until October 2, 2009.

On October 2, 2009, the Department notified Lt. Westmoreland that she had no leave remaining, so she was expected to report to the Academy on Monday, October 5, 2009 to undergo refresher training before returning to duty, which would be at the Emergency Operations Command. Lt. Westmoreland reported to the Academy as required. On October 8, 2009, Rasheed sent an email to various Department personnel expressing his concern about Lt. Westmoreland's return to full duty, noting that while he did not doubt her capacity to serve as a firefighter, she had a persistent preoccupation with being victimized or targeted that might hinder her from adequately discharging her duties. That same day, Lt. Westmoreland submitted a letter stating that because of "the past few years of the department's inequitable treatment, illegal and disturbing actions, and misuse of power" she was forced to retire, effective October 31, 2009. Westmoreland Retirement Ltr., Opp'n Ex. 15, ECF No. 63-16.

## IV.    The EEOC Complaint

Meanwhile, on September 29, 2009, Lt. Westmoreland submitted an Intake Questionnaire to the EEOC in which she complained about incidents that occurred during her time at Station 40. On December 18, 2009, Lt. Westmoreland's Charge of Discrimination issued. In the Charge, Lt. Westmoreland asserts that she was subjected to retaliation for her filing of the October 2006 EEOC Charge. She alleged that the retaliation began on January 19, 2009, with her removal from duty, included the July 2009 decision to require her to return to full operational duty, and continued until her retirement on October 31, 2009, which she claims to have been compelled.

On December 6, 2012, the EEOC found that there was reasonable cause to believe that Lt. Westmoreland's removal from duty was retaliatory and that this retaliation led to her involuntary retirement. On December 20, 2013, Lt. Westmoreland received a Right to Sue letter.

On March 18, 2014, Lt. Westmoreland filed suit in this Court asserting the six causes of action described above. Her case now proceeds as a Title VII action on two of those claims, Count II: retaliation in the form of removal from duty based on her December 9, 2008 email, and Count IV: retaliation in the form of constructive discharge in response to her October 2006 EEOC Complaint. On February 26, 2016, the County filed a Motion for Summary Judgment, to which Lt. Westmoreland responded on March 17, 2016. Lt. Westmoreland's memorandum in opposition to the Motion was erroneously docketed as a Cross-Motion for Summary Judgment, because Lt. Westmoreland asks only that summary judgment be denied to the County, not that it be entered in her favor.

## DISCUSSION

In seeking summary judgment, the County argues that (1) Lt. Westmoreland's claims fail under the doctrines of *res judicata*, collateral estoppel, and judicial estoppel on the theory that the claims were addressed in *Westmoreland I*; and (2) certain claims are barred by the statute of limitations. The County also argues that on her retaliation claim in Count II, Lt. Westmoreland has failed to present a genuine issue of material fact on the issue of causation, in part because she has not shown evidence of a recurring retaliatory animus and because legitimate, non-pretextual reasons existed for the removal from duty. On Count IV, the County argues that Lt. Westmoreland's working environment was not so pervasively abusive as to create a genuine issue of material fact on whether she was subjected to a constructive discharge. The County also

argues that Lt. Westmoreland's failure to respond timely to certain discovery requests warrants the granting of summary judgment to the County.

## I.     Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court must believe the evidence of the non-moving party, view the facts in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248) (internal quotation marks omitted). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

## II.     Preclusion and Estoppel

As an initial matter, the County seeks summary judgment on the basis of *res judicata*, collateral estoppel, and judicial estoppel, on the theory that this lawsuit treads the same ground as *Westmoreland I*. The Court considered the exact same *res judicata* argument as part of the County's Motion to Dismiss and painstakingly delineated the differences between the claims adjudicated in *Westmoreland I* and those that were new to, and thus could proceed in,

*Westmoreland II.* See *Westmoreland v. Prince George's Cty.* ("*Westmoreland II*"), No. TDC-14-0821, 2015 WL 996752 at \*9-12 (D. Md. Mar. 4, 2015). As part of that analysis, the Court specifically rejected the County's collateral estoppel argument that the issue of constructive discharge presented in Count IV had been fully litigated in *Westmoreland I. Id.* at \*11-12. Ironically, the County now regurgitates these same theories of preclusion even though they are plainly precluded by the law of the case. *See Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816 (1988) (stating that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case") (quoting *Arizona v. California,* 460 U.S. 605, 618 (1983)). The doctrine of the law of the case is a "practice of courts," "not a limit to their power," so a court may revisit its prior decisions, but "should be loath to do so in the absence of extraordinary circumstances." *Id.* at 817 (internal quotation marks omitted). Such extraordinary circumstances include (1) when a trial has resulted in substantially different evidence; (2) there has been a change in controlling legal authority that has made a contrary decision of law applicable to the issue; or (3) the prior decision was clearly erroneous or would result in manifest injustice. *United States v. Aramony,* 166 F.3d 655, 661 (4th Cir. 1999). Having offered no new evidence to justify any change to the Court's prior ruling, the Court sees no reason to revisit its prior rejection of the County's *res judicata* and collateral estoppel arguments.

To the extent that the County has arguably asserted a new judicial estoppel argument as to Count II based on a stipulation in *Westmoreland I* that Lt. Westmoreland filed no internal charges of discrimination during the period from October 18, 2006 to October 31, 2009, that argument fails. Employees engage in a protected activity when they file formal discrimination complaints or when they "complain to their superiors" about suspected unlawful discrimination.

*Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (quoting *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 543–44 (4th Cir. 2003)). Lt. Westmoreland sent her December 9, 2008 email, in which she asserted that she was the victim of unlawful harassment, to Capt. Reilly, one of her Station 40 supervisors, making that email a protected activity for purposes of a retaliation claim. The *Westmoreland I* stipulation that Lt. Westmoreland did not file any internal charges of discrimination between October 2006 and October 2009 thus does not preclude Lt. Westmoreland from asserting her Count II retaliation claim.

## III.    Statute of Limitations

The County claims that Lt. Westmoreland's "2007 Title VII claims," which it describes as relating to picture-taking, mailing of dirty gloves, and operational readiness of Station 40, are barred by the statute of limitations. Mot. at 10. In its ruling on the Motion to Dismiss, the Court limited the claims to the retaliation claims in Counts II and IV and specifically rejected a claim that Count II was barred by the statute of limitations. *See Westmoreland II*, 2015 WL 996752 at *12-13. Because there are no other claims remaining in the case, the request for summary judgment based on the statute of limitations is denied. The Court notes, however, that the facts of 2007 incidents may be considered to the extent they are relevant to Count II or Count IV. *See United Air Lines v. Evans*, 431 U.S. 553, 558 (1977) (stating that events beyond the statute of limitations, while not actionable in and of themselves, may still "constitute relevant background evidence in a proceeding in which the status of a current practice is at issue").

## IV.    Count II: Retaliation Based on Removal from Duty

The County seeks summary judgment on the retaliation claim in Count II, which the Court has concluded consists of a claim that Lt. Westmoreland was removed from duty on January 19, 2009 in retaliation for her December 9, 2008 complaint about harassment stemming

from the December 6, 2008 Acton Road altercation and the ensuing investigation. *See Westmoreland II*, 2015 WL 996752 at *11. Title VII prohibits retaliation against an employee because the employee has "opposed" an "unlawful employment practice." 42 U.S.C. § 2000e-3(a). A retaliation claim may be analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 550–51 (4th Cir. 2006). Under that framework, if a plaintiff states a *prima facie* case of retaliation, the burden shifts to the defendant to show that it had a legitimate, non-retaliatory reason for its contested action. *See id.* at 551. If the defendant makes such a showing, the burden then shifts back to the plaintiff to show that the stated reason was pretextual and that retaliation was the "actual reason" for the contested action. *See Foster v. University of Md.— Eastern Shore*, 787 F.3d 243, 253-54 (4th Cir. 2015).

### A.   *Prima Facie* Case

To establish a *prima facie* case of retaliation under Title VII, the plaintiff must show that (1) the plaintiff engaged in a protected activity; (2) the employer took an adverse employment action against the plaintiff, and (3) "there was a causal link between the two events." *Boyer-Liberto*, 786 F.3d at 281 (quoting *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405–06 (4th Cir. 2005)) (internal quotation marks omitted). Employees engage in a protected activity when they file formal discrimination complaints or "complain to their superiors" about suspected unlawful discrimination. *See Boyer-Liberto*, 786 F.3d at 281 (quoting *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 543–44 (4th Cir. 2003)). Here, the County asserts that Lt. Westmoreland has not presented evidence sufficient to support a finding of causation. Causation must be established at two stages of the *McDonnell Douglas* framework: first, in making a *prima facie* case, and second, in proving pretext and satisfying the ultimate burden of persuasion.

21

*Foster*, 787 F.3d at 250.   The difference between the two stages is that the burden for establishing causation at the *prima facie* stage is "less onerous." *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir.1989).   At this stage, causation may be proven by the proximity between when the protected activity took place and when the adverse employment action occurred. *See id.* ("Appellant's proof of a causal connection between the protected activity and her discharge essentially was that she was fired after her employer became aware that she had filed a discrimination charge.  While this proof far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality.").

The County's argument that causation was lacking is based on the extended gap between Lt. Westmoreland's 2006 Charge of Discrimination and her 2009 removal from duty.  On Count II, however, the protected activity was Lt. Westmoreland's December 9, 2008 email to her supervisor, in which she alleged harassment.  Lt. Westmoreland was removed from duty on January 19, 2009, approximately six weeks after she emailed Capt. Reilly to express her concerns about what she perceived to be continued harassment by the Department.  Capt. Reilly, in turn, was instrumental in—if not entirely responsible for—the decision to remove her from duty.  In particular, he appears to have had a role in referring Lt. Westmoreland to EAP and was perceived by Lt. Westmoreland as escorting her out of the fire station when she left for administrative leave.  Because Lt. Westmoreland was subjected to an adverse employment action only six weeks after her complaint, and a key decision-maker in Lt. Westmoreland's removal from duty was aware, and indeed the initial recipient, of her prior complaint, the Court concludes that Lt. Westmoreland has satisfied the less onerous burden of providing sufficient evidence to support an inference of causation at the *prima facie* case stage. *See Carter v. Ball*, 33 F. 3d 450,

460 (4th Cir. 1994) (finding that an adverse employment action that occurred six weeks after the plaintiff's protected activity was sufficient to support an inference of causation for purposes of establishing a *prima facie* case of retaliation).

## B.    Non-Retaliatory Reason

Because Lt. Westmoreland has established a *prima facie* case of retaliation, the burden shifts to the County to show that it had a legitimate, non-retaliatory reason for removing Lt. Westmoreland from duty. This is a burden of production, not persuasion, meaning that the County merely has to provide evidence demonstrating that the removal from duty was not in retaliation for the December 9, 2008 email complaint. *See Holland v. Washington Homes, Inc.,* 487 F.3d 208, 214 (4th Cir. 2007). The County easily carries this burden.

The County has presented evidence that following the December 9, 2008 email complaint, Lt. Westmoreland was involved in a significant altercation on January 19, 2009 with Volunteer Capt. Clagett and Volunteer Firefighter Addison while on the scene of an active building fire. According to the County's evidence, when Capt. Clagett questioned an action Lt. Westmoreland was taking, she began yelling and cursing, including shouting "shut the fuck up and get out." Clagett Stmt. She also berated Addison with profanity and insults about his height. This incident closely followed the December 6, 2008 altercation, during which Lt. Westmoreland responded to a request from Volunteer Lt. Thompson that her crew provide shovels for the Fire Marshal by yelling at him and pointing her radio antenna at him while on the scene of a house fire. When Capt. Duer arrived to intervene, Lt. Westmoreland yelled at him, too, and refused to give her name, rank, and identification number. The County's evidence also establishes, and Lt. Westmoreland does not dispute, that prior to these two incidents, Volunteer Lt. Thompson, Capt.

Duer, Volunteer Capt. Clagett, and Volunteer Firefighter Addison did not know her, nor did they know about her prior allegations of discrimination.

The County has thus produced evidence that would establish that in a six-week period, Lt. Westmoreland engaged in two separate, heated arguments with fellow firefighters, those arguments occurred while the parties were in the midst of fighting fires, and the disputes were so acrimonious that they became the subject of internal investigations. Moreover, the removal from duty came after Lt. Westmoreland had first been referred to EAP and a counselor had recommended that she go on administrative leave.

Finally, Capt. Reilly reported that on January 19, 2009, he heard Lt. Westmoreland threaten that she "should go get her Glock and shoot up everyone in here." Reilly Aff. ¶¶ 9-11. Although an affidavit from an official responsible for the adverse action at issue that is submitted in support of a motion for summary judgment should be viewed with caution, *see Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2d Cir. 1998), Lt. Westmoreland corroborated the key aspect of Capt. Reilly's assertion, acknowledging during a later interview that she did indeed make a comment, which she called a joke, asking Capt. Reilly if he thought that she was going to get a gun from her car to shoot others at the station. Although this comment appears to have occurred after the decision to place Lt. Westmoreland on administrative leave had been made, the fact that Lt. Westmoreland commented on the possibility of bringing a gun to the station, even if in jest, reinforces the conclusion that the previously imposed administrative leave was warranted.

In light of these events, the Court finds that the Department has presented evidence of a legitimate, non-retaliatory basis for removing Lt. Westmoreland from duty until it could be certain that she could discharge her duties effectively, namely concerns that she was unable to

perform her job effectively because she was unable to work cooperatively with other firefighting crews or was unable to handle the stress of the job.

## C.     Pretext

With the County carrying its burden of producing evidence of a legitimate, non-retaliatory reason for temporarily removing Lt. Westmoreland from duty, the burden shifts to Lt. Westmoreland to show that the County's explanation is pretextual.  Because Lt. Westmoreland alleges retaliation, she can show pretext only if she can demonstrate that were it not for the County's desire to retaliate against her for the December 9, 2008 complaint, she would not have been removed from duty.  *See Univ. of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2533 (2013) (holding that Title VII claims of retaliation require a showing of "but-for causation," meaning a plaintiff must provide "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer").  To do so, Lt. Westmoreland must present evidence that (1) the County's reason for removing her from duty was false; and (2) retaliation for her December 9, 2008 email was the real reason for her removal from duty.  *See Foster*, 787 F.3d at 252.  As a practical matter, the burden to show pretext "merge[s] with the ultimate burden of persuading the court" that the plaintiff has been the victim of unlawful retaliation, which Lt. Westmoreland can accomplish by showing that the County's proffered explanation is "unworthy of credence." *Holland*, 487 F.3d at 214 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

On summary judgment, Lt. Westmoreland need only present evidence sufficient to establish a genuine issue of material fact on whether the County's reason for removal from duty was pretextual.  Even viewing evidence in the light most favorable to Lt. Westmoreland, she has not met this standard.  Lt. Westmoreland does not dispute that on December 6, 2008 and January

19, 2009 she had altercations with various volunteer firefighters. What she does dispute is her role in those altercations, casting herself as a victim of unprofessional conduct by those other firefighters and framing her actions as responses to their provocation. But the great weight of the evidence points to Lt. Westmoreland as the instigator of the December 6, 2008 and January 19, 2009 altercations and her conduct as extremely unprofessional. In addition to the accounts of Lt. Thompson, Capt. Duer, Capt. Clagett and Firefighter Addison, the County has provided first-hand accounts from several other firefighters providing corroboration that Lt. Westmoreland yelled, screamed, and cursed at the other firefighters. Significantly, none of these eyewitnesses knew Lt. Westmoreland before the incidents and thus had no idea that she had ever complained to the Department about discrimination or harassment. Indeed, one of the affidavits relating to the December 6 incident—which specifically characterized her actions as unprofessional—was from an Assistant Fire Chief visiting from South Carolina. The County's version of the December 6, 2008 and January 19, 2009 altercations is thus based on the statements of individuals who had no axe to grind against Lt. Westmoreland.

Against this evidence, Lt. Westmoreland offers no corroboration of her account. The individuals on the scene who did know Lt. Westmoreland—namely the career firefighters on her crew—did not support the accounts of the firefighters from other stations, but they did not corroborate Lt. Westmoreland either. Instead, they essentially opted out, each asserting only that he had not seen or heard anything, a response that, according to volunteer members of Station 40, the career firefighters had been expressly instructed to give.

With none of the first-hand observers of the December 6, 2008 and January 19, 2009 incidents corroborating Lt. Westmoreland's account, and with those who placed the blame for those incidents squarely on Lt. Westmoreland having no discernible reason to target her, it is

difficult to conclude that Lt. Westmoreland has established a genuine dispute of fact whether she initiated the confrontations or whether she was the recipient of disrespectful, threatening behavior by other firefighters. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (holding, in an age discrimination case, that an employer would be entitled to judgment as a matter of law "if the plaintiff created only a weak issue of fact as to whether the employer's reason [for an adverse employment action] was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred").

Even if Lt. Westmoreland's solitary account is deemed sufficient to create a dispute of fact on who started these incidents, that dispute is not material, because the undisputed facts do not refute the County's legitimate, non-retaliatory reason to remove her from duty temporarily, or otherwise support a finding of retaliation. Lt. Westmoreland's account of the two incidents leading up to her removal from duty directly contradicts only the origin, not the result, of the altercations. The County's evidence suggests that Lt. Westmoreland provoked the altercations; Lt. Westmoreland's account suggests that she was provoked into responding, but that she took the bait. The record makes clear, however, that regardless of how they began, these incidents became serious altercations that prompted internal investigations. Although Lt. Westmoreland asserts that on January 19, 2009, Capt. Clagett should not have confronted her because she was carrying out orders from a battalion chief, she has acknowledged that there was an "exchange of words," Westmoreland Stmt., and did not deny in her statement about the incident that she engaged in a heated exchange and used significant amounts of profanity. Likewise, although Lt. Westmoreland asserts that on December 6, 2008, she found Lt. Thompson's demeanor and conduct threatening and unprofessional, she does not deny that there was a heated exchange and that she yelled at him to get out of her space. Thus, even if Lt. Westmoreland did not initiate the

altercations, she was unable to refrain from unprofessional conduct. The undisputed fact that she participated in not one, but two such incidents in the space of six weeks could reasonably be a cause for concern, particularly considering the self-evident need for firefighters to focus and cooperate on often urgent and potentially life-threatening tasks at hand. The fact that, by February 2, 2009, Lt. Westmoreland was seeking to extend her leave, citing work stress, lends credence to the Department's determination on January 19, 2009 that Lt. Westmoreland was appropriately removed from duty temporarily.

Most importantly, even accepting Lt. Westmoreland's account of the origins of the incidents, she has offered no evidence, other than temporal proximity, to connect the removal from duty to the December 9, 2008 complaint. No action was taken against her in the immediate aftermath of her complaint; the only action occurred after the intervening event of the January 19, 2009 incident. There is no evidence that any Department official expressed displeasure with her December 9, 2008 email, or even mentioned it, before or after the January 19, 2009 incident. There is also no evidence that Rasheed, the EAP counselor who recommended that she take administrative leave, was aware of her December 9, 2008 complaint. Because the County has put forth evidence of a legitimate non-retaliatory basis for temporarily relieving Lt. Westmoreland of her duties, and Lt. Westmoreland has failed to present evidence sufficient to refute it or otherwise to establish a genuine issue of material fact on causation, the Court grants the County's Motion for Summary Judgment on Count II.

## V.      Count IV: Retaliation Based on Constructive Discharge

In Count IV, Lt. Westmoreland alleges that retaliation against her for filing the 2006 EEOC Charge led to her constructive discharge from the Department in October 2009. An employee is constructively discharged when an employer "deliberately makes [the] employee's

working conditions intolerable and thereby forces him to quit his job." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985). To establish a claim of constructive discharge, a plaintiff must establish that: (1) the employer took deliberate actions to make working conditions intolerable, and (2) that those conditions were actually intolerable. *Id.* However, "mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions" are not enough. *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 378 (4th Cir. 2004) (quoting *Carter*, 33 F.3d at 459) (internal quotation marks omitted). Instead, an employee must be subjected to "unreasonably harsh conditions, in excess of those faced by his co-workers." *Carter*, 33 F.3d at 459. Whether working conditions are intolerable is determined by using the "objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign." *Bristow*, 770 F.2d at 1255.

Because Lt. Westmoreland cites retaliation for her filing of her October 2006 EEOC Charge as the trigger for her constructive discharge claim, she has the additional task of adducing evidence of that retaliation, namely, as noted above, that (1) she engaged in a protected activity; (2) the employer took an adverse employment action against her, specifically, a constructive discharge; and (3) there was a causal link between these events. *Boyer-Liberto*, 786 F.3d at 281; *cf. Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004) (requiring, in a case in which the plaintiff alleged the "compound claim" of constructive discharge based on a hostile work environment, that the plaintiff adduce evidence of both a hostile work environment and constructive discharge). Lt. Westmoreland has failed to establish a genuine issue of material fact on either the requirements of a constructive discharge or the element that the discharge was caused by a retaliatory motivation.

## A.    Constructive Discharge

Read liberally, Lt. Westmoreland's claim of constructive discharge is based on (1) a series of incidents between 2006 and 2009 that she considered to be harassment; (2) the investigations and discipline that resulted from those incidents; and (3) the decision in July 2009 to require her to return to full active duty, against the recommendations of her psychiatrist.

To be sure, Lt. Westmoreland was the subject of several incidents that she considered to constitute harassment, but the evidence relating to these incidents does not support the inference that the Department deliberately generated these incidents with the intent to force her to quit.  In March 2007, Lt. Westmoreland was the subject of a complaint by some of the volunteer firefighters of Station 40, but that complaint was resolved with no disciplinary action and was followed shortly after by a favorable performance review for Lt. Westmoreland.  Similarly, in December 2007, Lt. Westmoreland was written up for her crew's failure to leave its equipment in a state of operational readiness, which led to a brief probationary period that ended without further incident.  In light of the modest consequences of this incident and, importantly, Lt. Westmoreland's acknowledgment that at least some of the identified deficiencies were true, it is difficult to interpret that incident as contributing to intolerable conditions.

After 2007, the allegedly harassing incidents all involved firefighters or emergency personnel from outside Lt. Westmoreland's station. The May 2008 incident in which paramedics allegedly photographed her extrication of a vehicle passenger involved paramedics from Station 25, and the subsequent investigation revealed that the Station 25 captain did not share their level of concern and believed that his paramedics had shown disrespect to Lt. Westmoreland.  The December 2008 incident in which dirty gloves were presumed to be hers involved a volunteer fire chief from the Clinton Fire Station, who was later admonished by a battalion chief. The

December 6, 2008 Acton Lane incident involved firefighters from Waldorf Volunteer Fire Department, and the January 19, 2009 incident involved firefighters from the Baden Volunteer Fire Department. Even if the individual firefighters or other personnel involved in these altercations had improper motives, there is no evidence that they were part of a Department effort to create intolerable working conditions for Lt. Westmoreland. *See Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1356 (4th Cir. 1995) (noting that to succeed on a constructive discharge claim, a plaintiff must adduce evidence demonstrating "the employer's intent to force the employee to quit").

To the extent that Lt. Westmoreland argues that the Department's allegedly uneven handling of complaints—both those lodged against her and those she made—created intolerable working conditions that would support a claim of constructive discharge, the evidence does not support such a finding. Her repeated assertion that her versions of events were not given adequate weight or that others were too quick to believe negative statements about her is insufficient to establish that she was forced to work in an intolerable situation. *See James*, 368 F.3d at 378 (holding that "a feeling of being unfairly criticized, or difficult or unpleasant working conditions" is not enough to support a claim of constructive discharge). Nor has Lt. Westmoreland presented evidence to show that the discipline meted out as a result of these investigations was "unreasonably harsh" and "in excess" of that faced by her co-workers. *Carter*, 33 F.3d at 459. The 2007 incidents led only to brief periods of increased oversight. The 2008 incident with paramedics led to no disciplinary consequences for Lt. Westmoreland whatsoever, and indeed Battalion Chief Snyder concluded that it was the paramedics whose conduct had been disrespectful. The 2008 glove incident was resolved in Lt. Westmoreland's favor. And, as discussed above, the Department's decision in response to the 2008 and 2009

31

altercations to remove Lt. Westmoreland from duty was, even based on Lt. Westmoreland's version of those events, a proportionate response. Nor can the later imposition of Step II disciplinary charges for the December 2008 altercation be considered unreasonably harsh, considering that that process involves only placing a notice of unsatisfactory conduct in the employee's file. *Cf. Carter*, 33 F.3d at 459 (remarking that even "[a] slight decrease in pay coupled with some loss of supervisory responsibilities" do not amount to unreasonably harsh conditions that would support a claim of constructive discharge). Further, Lt. Westmoreland has presented no evidence on how other personnel who had not filed EEOC complaints have been disciplined under similar circumstances, and thus has not provided any basis for this Court to infer that the discipline she received was imposed with deliberate intent to force her to resign.

Lt. Westmoreland is thus left with only her final contention that the Department's decision to return her to full-time duty in October 2009 left her no choice but to resign. She argues that the duty assignment she was given, which the record indicates was a position at the Department's Emergency Operations Command but which Lt. Westmoreland claims was going to be at a station, was at odds with the July 2009 determination of her psychiatrist that she could return to full duty but should be placed in a non-operational status. Lt. Westmoreland's point is not without record support. Her EAP Counselor, Latif Rasheed, expressed concern that the Department's duty placement was contrary to the psychiatrist's clinical plan. However, the decision must be viewed in the context of the accommodations provided to Lt. Westmoreland between January and October 2009. At first, Lt. Westmoreland was on sick leave from January 23, 2009 to February 2, 2009. She then requested and was approved for FMLA leave through March 4, 2009. At her request, that leave was extended to April 4, 2009. Then, in April 2009, she returned to work on light duty, in the Bureau of Occupation and Safety Health, at her full

salary. When the Department's Medical Advisory Board concluded in August 2009 that Lt. Westmoreland was fit for full duty, Lt. Westmoreland requested and received permission to take FMLA leave until October 2009. It was only after her leave was exhausted that she was ordered to return to full duty at the on October 5, 2009. Given that the Department provided several accommodations prior to ordering Lt. Westmoreland to full duty, the decision was based on the recommendation of the Department's Medical Advisory Board, and there is no documentary or testimonial evidence otherwise suggesting a deliberate effort to force Lt. Westmoreland to quit, the Court finds that Lt. Westmoreland has not established a genuine issue of material fact on the issue of constructive discharge, specifically, the requirement that the Department had the deliberate intent to force Lt. Westmoreland to quit.

### B.    Causation

Even if the 2009 decision to return Lt. Westmoreland to full duty could be deemed to have created an "intolerable condition" that the Department deliberately created in order to force her to quit, her claim founders because she has not presented sufficient evidence to support a finding that the action was in retaliation for the 2006 EEOC Charge. In establishing causation, "the passage of time" tends to "negate the inference of discrimination." *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004). When there is a significant temporal gap between the protected activity and the adverse employment action, "courts may look to the intervening period for other evidence of retaliatory animus." *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007). To create a link between her 2006 EEOC Charge and her 2009 resignation adequate to defeat the Motion for Summary Judgment, Lt. Westmoreland therefore must provide evidence of an ongoing retaliatory animus that culminated, three years later, in an intolerable working environment. She has not.

Lt. Westmoreland's causal chain breaks early. In 2007, after her first year at Station 40, she received a very positive performance evaluation that earned her a merit raise. That evaluation was supplemented by a detailed and highly complimentary letter from Capt. Ludy, which was passed on to the Fire Chief.

Furthermore, the incidents from 2007 to 2009 were discrete, chance encounters that Lt. Westmoreland had with individuals from different fire stations or entirely different emergency response services, so they cannot credibly be cast as part of an orchestrated retaliatory effort by Station 40 leadership or the Department. Indeed, the evidence appears to establish that Lt. Westmoreland's fellow firefighters at Station 40 did not undermine her during these incidents. When interviewed about the December 6, 2008 and January 19, 2009 incidents in which she was alleged to have yelled and cursed at volunteer firefighters from other stations, her crew generally claimed in their statements that they did not see or hear anything.

Crucially, there is no evidence that any of the individuals who engaged in the allegedly harassing activity in December 2008 and January 2009, or any of the supervisors who subsequently investigated those altercations, were aware of her 2006 EEOC Charge, so they could not plausibly be said to have been part of an effort to retaliate against her because of it. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (noting that for a plaintiff to succeed on a retaliation claim it is "absolutely necessary to establish" that the employer knew that the plaintiff "engaged in a protected activity").

Finally, the claim that the requirement that Lt. Westmoreland report for full duty in 2009 was a retaliatory constructive discharge also fails on the issue of causation. There is no evidence that any member of the Medical Advisory Board, whose recommendation of full duty triggered the decision, had any knowledge of Lt. Westmoreland's 2006 EEOC Charge. Moreover, Lt.

34

Westmoreland retired from the Department in October 2009, three years after she filed her October 2006 EEOC Charge.  As discussed above, there is no evidence in the record that during those intervening years there was a pattern of retaliatory activity that could tether the 2009 order to return to operational status to her 2006 protected activity.  Without such ongoing retaliatory animus, the extended passage of time here "negate[s] the inference of discrimination." *Price*, 380 F.3d at 213.

Although Lt. Westmoreland appears to seek to prove that the various incidents from 2007 to 2009 were initiated as a result of a discriminatory animus or lack of respect on the part of the individuals encountered by Lt. Westmoreland, and in some instances Department supervisors or investigators concluded that she had been subjected to a lack of respect, the Court is not charged with resolving that issue.  Based on the remaining counts in the Complaint which are limited to retaliation claims, the Court's task is to assess whether there is evidence to support the conclusion that Lt. Westmoreland was subjected to an ongoing retaliatory motivation arising from the 2006 EEOC Charge that resulted in a constructive discharge.  Having found a lack of evidence sufficient to establish a genuine issue of material fact on that question, the Court grants the County's Motion for Summary Judgment as to Count IV.

Because the Court grants the Motion, it need not address the County's claim that summary judgment is warranted based on discovery violations.

## CONCLUSION

For the foregoing reasons, the County's Motion for Summary Judgment is GRANTED,

Lt. Westmoreland's Opposition to that Motion, to the extent that it asserts a Cross-Motion for

Summary Judgment, is DENIED, and the County's Motion to Strike Lt. Westmoreland's

Opposition to the County's prior Motion for Summary Judgment is DISMISSED AS MOOT.  A

separate Order shall issue.


Date:  September 30, 2016

THEODORE D. CHUANG
United States District Judge